UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re:

ALABAMA MARBLE CO., INC.,   }   Case No. 14-40157-JJR

Debtor.   }   Chapter 11

_____

## OPINION AND ORDER

### Introduction

The matters before the Court in this chapter 11 case include a pitched battle between Alabama Marble Co., Inc. (the "Debtor"), and its newly-arrived, successor landlord, TBGS Quarry, LLC ("TBGS"). Their fight is over who has the right to operate a marble quarry located in Talladega County, Alabama, near the town of Sylacauga. TBGS claims the Debtor's leasehold interest in the quarry, including the Debtor's right to extract marble, was terminated before the Debtor sought chapter 11 relief. TBGS wants the Debtor out of the quarry so TBGS can mine marble for its own use. However, the Debtor wants to remain in possession, and asserts that the quarry lease (the "Lease" and more particularly identified *infra*) it negotiated over 15 years ago with its original landlord remains in full force and effect. Indeed, over the objection of TBGS, the Debtor proposes to assume the Lease, although it has not yet proposed a plan of reorganization. The Lease is indispensable if the debtor has any chance to reorganize.

### Pleadings and Claims

TBGS filed a Motion to Confirm Relief From Stay (Doc. 13, and herein the "Stay Relief Motion") in which it sought an order confirming that the automatic stay imposed under

§362(a) of the Bankruptcy Code[1] was not applicable to TBGS's efforts to obtain possession of the marble quarry. As mentioned above, TBGS contends the Debtor's leasehold interest in the quarry was terminated prepetition, and if that contention is accurate, the automatic stay does not apply to an act to obtain possession of property covered by a lease that was terminated before the commencement of a bankruptcy case. § 362(b)(10). A few days after filing the Stay Relief Motion, TBGS filed its Alternative Motion to Compel Rejection of Lease (Doc. 81, herein the "Rejection Motion" and together with the Stay Relief Motion, the "TBGS Motions") in which it asked the Court, pursuant to § 365(d)(2), to order the Debtor to reject the Lease in the event the Court found the Lease had not been terminated prepetition.

The Debtor filed its Response to Rejection Motion (Doc. 162), and conceded it was appropriate for the Lease to be either assumed or rejected, and asked the Court to set a deadline for the same, suggesting April 11, 2014, which has long since come and gone. A few days later, the Debtor filed a Motion for Entry of an Order Authorizing Assumption of Lease Pursuant to 11 U.S.C. § 365(b)(1) (Doc. 196, herein the "Debtor's Motion to Assume" and together with the TBGS Motions, the "Motions") in which the Debtor sought an order authorizing it to assume the Lease.

Jurisdiction

The issues and claims raised in the Motions are contested matters under Rule 9014 of the Federal Rules of Bankruptcy Procedure, and are core proceedings under 28 U.S.C. § 157(b)(2). This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and the General Order of Reference dated July 16, 1984, as amended July 17, 1984, entered by the United States District Court of the Northern District of Alabama.

---

[1] 11 U.S.C. § 101 *et seq.* and herein the "Code." The symbol "§" when used herein is a reference to a section or other subdivision of the Code unless the context indicates otherwise.

2

Background

The court conducted a 5-day evidentiary hearing on the issues raised and claims asserted in the Motions. Numerous witnesses testified, including the parties' principals, their employees and agents, and several expert witnesses; over 250 exhibits were admitted. And post-trial briefs of 25 pages and 65 pages were submitted by the Debtor and TBGS, respectively. The logical, or at least the simplest, place to start this discussion is with the Lease that establishes the parties' rights and obligations with respect to the marble quarry. The Debtor and TBGS's predecessor, Purple Mountain Marble Company, Inc. ("PMMC") – the original landlord – entered into a Ground Lease With Right to Extract Minerals, dated November 4, 1998 (TBGS Ex. 5).[2] Subject to various terms and conditions, the Lease entitled the Debtor, as lessee, to mine and extract marble from a quarry owned and previously operated by PMMC. The initial Lease term was for ten years, commencing January 1, 1999 and terminating December 31, 2009. The Lease gave the Debtor an option to extend the term for an additional ten years, through December 31, 2019, and that option was exercised. (Debtor Ex. 9; TBGS Ex. 182.)

For a fixed monthly rent payment, the Debtor was entitled to extract up to 180,000 gross cubic feet of marble per year, plus whatever marble was purchased by PMMC. An additional $2.25 was payable for each cubic foot of marble extracted in excess of the 180,000 annual maximum.

PMMC and the Debtor entered into an agreement dated May 1, 2002 (TBGS Ex. 35 and herein, the "Modification") modifying the Lease and a related agreement dated November 4, 1998 (the "Related Agreement"). Neither party offered the Related Agreement into evidence.

---

[2] Apparently the parties must at least agree about what property is covered by the Lease. Paragraph 1 of the Lease refers to an attached exhibit for a description of the property; however, the copy of the Lease admitted into evidence and the copy attached to TBGS's Motions do not have an attached exhibit or otherwise contain a description of the leased property.

3

Regardless, among other amendments made to the Lease and Related Agreement, the Modification increased the maximum quantity of marble that could be excavated each year without payment of the additional $2.25 per cubic foot, from 180,000 to 500,000, deleted the Debtor's obligation to sell marble to PMMC, and deleted "the commissions provision described in section 3.b of the [Related Agreement]."[3] Apparently the "commission provision" was a reference to the Debtor's obligation under the Related Agreement to pay a 20% commission to PMMC on all "block marble" sold by the Debtor or sold by PMMC as selling agent for the Debtor. (Debtor Ex. 12.)[4]

Paragraph 15 of the Lease describes several "events of default" and upon the occurrence of such an event PMMC could elect to "(1) collect each installment of rental hereunder as and when the same matures, (2) terminate the term of [the] Lease without further liability to [Debtor] hereunder, or (3) terminate [Debtor's] right to possession and occupancy of the Leased Property without terminating the term of this Lease, and in the event Lessor shall exercise such right of election the same shall be effective as of the date of written notice of Lessor's election given by the latter to [Debtor] at any time after the date of such event of default." There was no grace period to cure defaults except, to a limited extent, for the failure to pay rent.

---

[3] The Debtor never quarried more than 180,000 cubic feet of marble before the Modification, and never more than 500,000 after the Modification.

[4] The only reason the deletion of the 20% commission provision might be relevant is to show that PMMC had relinquished its right to be a commissioned sales agent for the Debtor as originally contemplated under paragraph 6 of the Lease. Following that deletion, it would be logical for the Debtor to sell block marble directly to its customers, as in fact it did on a regular and recurring basis while PMMC was its landlord. Paragraph 6 of the Lease contemplated the possibility of the Debtor selling marble "other than through its own marble shop operations . . . subject to the consent of [PMMC] which consent shall not unreasonably be withheld." If that consent was not expressly given – we don't know because Bernard Strauss nor anyone else from PMMC testified – the course of conduct during the first 15 years of the Lease term – before TBGS became the landlord – confirmed PMMC's acquiescence and tacit approval of sales by the Debtor "other than through its own marble shop operations." Thus, TBGS's objection that the warranty in paragraph 6 was violated when marble extracted by the Debtor was sold and not used primarily to supply the Debtor's marble shop operations was without merit. In any event, that objection apparently was an afterthought because it was not raised in the TBGS Motions.

4

Lease paragraph 18, entitled "Alternative Dispute Resolution Clause," is critical to the Court's ruling on the Motions. It reads:

> THE PARTIES TO THIS AGREEMENT HEREBY EXPRESS THAT ALL DISPUTES, CONTROVERSIES OR CLAIMS OF ANY NATURE BETWEEN THE PARTIES HERETO, ARISING OUT OF OR IN ANY WAY RELATED TO THE WITHIN AGREEMENT, ITS INTERPRETATION, PERFORMANCE OR BREACH, SHALL BE RESOLVED EXCLUSIVELY BY THE FOLLOWING ALTERNATIVE DISPUTE RESOLUTION MECHANISMS:
>
> A. Negotiations . . .
>
> B. Should negotiations be unsuccessful, the parties shall engage in mediation . . .
>
> C. Should . . . mediation be unsuccessful, the parties agree to arbitrate . . . .

(TBGS Ex. 5.)

Although there were some disagreements (*see*, *e.g.*, Debtor Exs. 11-14), for the most part it appeared the relationship between the Debtor and PMMC was amicable. The Debtor's president, Stephen Musolino, and PMMC's president, Bernard Strauss, were both in the marble business, and Strauss operated the quarry before it was leased to the Debtor. Musolino testified that he and Strauss were friends, and when an issue arose about the quarry or Lease, they were able to work things out in a telephone conversation. That appeared to be the case. For example, on December 21, 1998, soon after the Lease was signed, Strauss sent a letter to Musolino expressing his "thanks for allowing me the time to recuperate my mind, body, and spirit. Not having to worry about the day to day details of running the quarry and satisfying your needs has removed a great burden from me." (Debtor Ex. 11.) However, he went on to say he was concerned about the Debtor's ability to supply PMMC with sufficient marble inventory to meet the demands of PMMC's customers. But Strauss was conciliatory, and he continued by saying they could discuss the issue "when I visit you in Miami before the first of the year." He ended the letter as you might expect when a business relationship had become closer than arm's-length:

5

"I hope you and your family have a merry Christmas and the new year [sic] continues to bring health and prosperity to you and your family." Similarly, when PMMC's attorney wrote the Debtor's attorney to confirm the renewal of the Lease, he ended his letter by saying, "My client [i.e., PMMC] looks forward to another ten years of continued good relations with Stephen Musolino [i.e., the Debtor]." (Debtor Ex. 9.) Despite the amicable relationship between the principals of the Debtor and PMMC, Strauss nonetheless had his price and TGBS was willing to pay it.

On August 23, 2013, PMMC and TBGS entered into a Purchase and Sale Agreement (TBGS Ex. 45, and herein the "Sale Agreement"), whereby PMMC agreed to sell the quarry to TBGS for $6.75 million.[5] The Debtor, as the quarry's lessee, was given short shrift in the Sale Agreement: In Section 4(b), PMMC and TBGS acknowledged that TBGS's right to make an inspection of the quarry was subject to the "rights of an existing tenant" – no effort was made to identify the tenant by name. And in Section 9(b) one of the conditions to closing the sale was the delivery to TBGS of a termination of the Lease, but the date of the Lease and the lessee's name were left blank. Similarly, the documents required for closing described in Section 11(h) mentioned the "Lease Termination", but again failed to identify the quarry's tenant other than as the "exiting Tenant."[6]

Soon after the Sale Agreement was signed, it became apparent the Debtor was not about to voluntarily terminate the Lease and surrender the quarry. TBGS and PMMC entered into an Amendment to Purchase and Sale Agreement (TBGS Ex. 46, and herein the "Amendment" and

---

[5] The purchaser in the Sale Agreement was TBGS Holdings, LLC. Paragraph 19 of the Sale Agreement provided that it may be assigned to an affiliate of the named purchaser. The Court assumed such an assignment was made to TBGS Quarry, LLC.

[6] One has to wonder whether the description of the tenant – exiting – was a typo or wishful thinking.

6

together with the Sale Agreement, the "Amended Sale Agreement"), which contained specific provisions pertaining to the "Removal of Tenant."[7] The Amendment stated that TBGS "shall be entitled, on behalf of [PMMC], to take all steps reasonable [sic] necessary to obtain the Lease Termination, including, without limitation, the right to file an eviction proceeding and for any other relief or determination necessary to obtain the Lease Termination and to remove the existing tenant from the Property." The Amendment provided for the $6.75 million purchase price to be escrowed pending closing, and Section 3(a)(i) allowed up to $150,000 of the escrowed funds to be used to pay "the expense of obtaining the Lease Termination . . ." In other words, the Amendment established a war chest to oust the Debtor from the quarry. In essence, the transaction contemplated by the Amended Sale Agreement made the Debtor the target of what was tantamount to a hostile takeover – the *Barbarians* [*Were*] *at the* [*Quarry*] *Gate*.[8]

It was evident that the only reason for PMMC's complicity in the efforts to obtain an early termination of the Lease was to facilitate the sale and to make way for TBGS to take over the quarry. There was no evidence that PMMC and its president, Bernard Strauss, otherwise had any interest in or motive for an early termination of the Lease, or were concerned with the Debtor's mining methods and operations. Suffice it to say, that if PMMC had remained the Debtor's landlord, and TBGS had not come into the picture, so long as the monthly rent was paid, it was unlikely the Debtor's operations at the quarry would have become an issue. But that was not to be. Without any warning, Strauss threw Musolino, his long-time business associate and tenant (if not a personal friend), under a hypothetical bus. Strauss did not testify, either in

---

[7] The Amendment, Section 2.

[8] *Barbarians at the Gate* was a TV movie based on a book by Bryan Burrough and John Helyar, that told the story of the leveraged buyout of RJR Nabisco.

7

Case 14-40157-JJR11    Doc 385    Filed 08/08/14    Entered 08/08/14 12:18:59    Desc
Main Document    Page 7 of 16

person or through deposition; he was not to be bothered. Strauss took his $6.75 million, and left Musolino and the Debtor to fend for themselves.

On December 2, 2013, TBGS's attorney, "on behalf of Purple Mountain Marble Company, Inc." sent a letter via certified mail to the Debtor and its president, Stephen Musolino, purporting to terminate "the right of [the Debtor] to possession of the leased premises . . . ." (TBGS Ex. 6.) The letter stated that "the reason for such termination is the occurrence of numerous events of default" and then described those events and identified the paragraphs of the Lease that contained covenants that allegedly had been breached. Non-payment of rent was not one of the events of default TBGS claimed had occurred. Although by then Musolino knew something was amiss, the letter did not mention TBGS or that the quarry was being sold.

On December 9, 2013, the Debtor replied through its attorney and denied there was any breach or default, and asserted that "It is Alabama Marble Company's belief that this is a contrived effort to declare a default so that your client [i.e. PMMC] can enter into what it deems to be a more favorable transaction rather than living under the Ground Lease with Alabama Marble Company."[9] (Debtor Ex. 10; TBGS Ex. 183.) The reply ended with a reference to the alternative dispute resolution provisions in the Lease, and reserved the right to have the parties' disputes resolved pursuant to the "dispute resolution procedures including negotiations, mediation, then arbitration."

PMMC, or more accurately, TBGS, was not deterred, and on December 20, 2013 filed a complaint, entitled "Statement of Claim, Eviction/Unlawful Detainer" in the Talladega County District Court. (Debtor Ex. 15; TBGS Ex. 184.) The complaint alleged PMMC – still no mention of TBGS or the pending sale – was demanding the right to possession of the leased property, and that "Plaintiff terminated the lease on December 2, 2013 [and] Defendants have willfully refused

---

[9] The evidence confirmed the Debtor's belief about PMMC's motivation.

8

to surrendered [sic] possession." On December 27, 2013, the Debtor filed a Motion to Dismiss or to Stay Litigation, its initial response to the complaint. (Debtor Ex. 15.) The motion attached a copy of the Lease, and emphasized that in Lease paragraph 18, the parties had agreed to resolve their disputes by an alternative dispute resolution procedure, including arbitration. The motion asked the county district court to either dismiss the complaint, or stay the litigation and direct the parties to resolve their disputes pursuant to the procedure provided in the Lease.

Notwithstanding the purported termination of the Lease and demand for possession, the Debtor continued to tender payment of the monthly rent to PMMC. By letter dated January 7, 2014, Bernard Strauss, as president of PMMC, returned the Debtor's January 2014 rent and for the first time informed Stephen Musolino and the Debtor that the new owner of the quarry was TBGS. (TBGS Ex. 36.)[10]

The evidence did not paint a very flattering picture of TBGS – it came across as a bully – at least with respect to its efforts to get control of the quarry from the Debtor. TBGS was not coy about what it was trying to accomplish, and it would probably respond that all is fair in love, war, and the marble business. Indeed, the Debtor can point to nothing TBGS has done that violated any law or regulation, and neither can the Court – TBGS and Strauss simply did not play very nice. That said, after considering the testimony and other the evidence, the Court must question not only the good faith of TBGS (and Strauss), but also the *bona fides* of the Debtor and its principals. Something clandestine, if not nefarious, is going on with respect to the Debtor's quarry operations and finances; and if that is not the case, then – to be blunt – the Debtor's principals and investors are, from at least a financial standpoint, inept.

The Debtor has never made a profit. Never. In fact, its accumulated losses exceed $23 million. But-for large injections of cash by the Debtor's principals and investors, it would have

---

[10] According to TBGS's Motions, the sale closed and the quarry was conveyed to TBGS on December 31, 2013.

9

closed its doors, and the quarry, years ago. The Debtor recently supplied marble for an upscale condominium project in New York City, and the Debtor touts the new business as a harbinger of future profits. However, the evidence was less than convincing that the long-term prospects for success, or even a breakeven year, were likely.

Analysis and Conclusions

In the Stay Relief Motion, TBGS claimed four non-monetary events of default had occurred under the Lease. As a consequence of those events, and proper notice, TBGS argues that the Lease was terminated before the Debtor filed its chapter 11 case. Those alleged defaults were the Debtor's failure to (a) conduct quarrying operations in a good and workmanlike manner as required by Section 5(a) of the Lease; (b) name its landlord and the Debtor as insured persons on all insurance policies and provide evidence of such insurance as required by Section 13(c) of the Lease; (c) satisfy a recorded judgment against the Debtor as required by Section 15 of the Lease; and (d) comply with applicable rules, regulations and laws as required by Section 15 of the Lease. But TBGS would have the Court ignore paragraph 18 (the "ADR Clause") of the Lease, which requires "all disputes, controversies or claims of any kind and nature . . . be resolved exclusively by . . . negotiation [and if] unsuccessful, [then] mediation … [and if] unsuccessful, [then] arbitration . . . . " The Debtor's initial response to the termination notice denied any defaults had occurred – hence a dispute and controversy arose – and reserved its right to have the same resolved pursuant to the ADR Clause. Likewise, the Debtor's initial, and apparently only response to TBGS's unlawful detainer complaint filed in state district court, was a request for that court to stay the litigation and direct the parties to resolve their disputes pursuant to the ADR Clause.

Alternative dispute resolution provisions, such as the negotiate-mediate-arbitrate ADR Clause in the Lease, are fully enforceable, cannot simply be ignored, and "in interpreting [such provisions], 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .'" *The Dunes of GP, L.L.C. v. Bradford*, 966 So. 2d 924, 927 (Ala. 2007), (quoting *Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). Under the far-reaching Federal Arbitration Act ("FAA"), "'courts must rigorously enforce arbitration agreements according to their terms . . . .'" *Walthour v Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1329-30 (11th Cir. 2014) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. ---, ---, 133 S. Ct. 2304, 2309 (2013)). The FAA explicitly provides that an agreement to arbitrate a contract dispute "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see Walthour*, 745 F.3d at 1329.

Code § 365(c) does not allow a trustee or debtor to revive a nonresidential real property lease that was terminated prepetition. Had the Lease not contained the ADR Clause (or had the Debtor not disputed the alleged defaults), the Lease might have suffered a quick pre-petition demise. But it was not that simple. The three-tiered dispute resolution mechanism mandated by the Lease required that negotiation and mediation be attempted prior to arbitration, and unequivocally required this process as the exclusive means for resolving the broad category of "all disputes, controversies or claims of any kind and nature." TBGS's argument that the contract did not require that the ADR process be followed in order to terminate the Lease, because the Lease gave it the right to terminate the Debtor's possessory rights immediately upon the delivery of notice, would be persuasive had the termination notice been accepted by the Debtor without complaint. However, upon the Debtor's response *disputing* that any default had

11

occurred and *disputing* the purported termination, the broadly worded ADR Clause came into play. At that point, the termination was not a *fait accompli* but rather a *claim* subject to the ADR Clause requirements. To rule otherwise would be to imply, for no logical reason, an exception for disputes, controversies or claims related to Lease termination.

Reading the Lease as a whole, the ADR Clause, when invoked, operates as a limit on the ability to terminate the Lease by simply delivering a notice of termination after an alleged default. The ADR Clause instead gives the Debtor a contractual right to dispute the claimed default and have that dispute resolved through the ADR process prior to the Lease being terminated. Unless the Debtor would have conceded an event of default had occurred through negotiations or mediation, which was unlikely given its position throughout this case, then an arbitration award in favor of TBGS – finding an event of default – followed by notice of termination, would have been necessary to effect a termination of the Lease. However, the parties never got that far; apparently they negotiated without success, and had selected a Birmingham lawyer (Charles Denaburg) to conduct mediation. Before mediation commenced, however, the Debtor filed chapter 11, and all proceedings to terminate the Lease were stayed under § 362(a). The parties never reached the final stage of the process – arbitration – anticipated by the ADR Clause. Thus, the Debtor's interest – possessory or otherwise – in the Lease was not terminated before it sought chapter 11 relief, and § 362(b)(10) has no application here. The Lease lives on, and is subject to rejection or assumption by the Debtor under § 365.

Anticipating that it might lose the first round, TBGS's alternative position, as expressed in its Rejection Motion, is a request for the Court to order the Debtor to reject the Lease. And not unexpectedly, the Debtor's Assumption Motion seeks Court permission to assume the Lease. Leases are assets of the estate, and often, as in this case, are essential if a debtor's business is to

Case 14-40157-JJR11    Doc 385    Filed 08/08/14    Entered 08/08/14 12:18:59    Desc
Main Document    Page 12 of 16

continue. Without the Lease, the Debtor's core business – quarrying marble – will end and with it any possibility of reorganization. Thus, assumption is favored when it preserves value for the estate and improves the probability of a successful reorganization, but in all cases assumption must be based on sound business judgment. Although court approval is a prerequisite to assumption under § 365(a), courts generally defer to a debtor's exercise of its sound business judgment. But that is not to say a court should turn a blind eye to a patently bad decision.

Based on the evidence, the only credible justification for the Debtor to assume the Lease is that, without the Lease, it cannot continue its business. But during the 15 years the Lease has been in effect, the Debtor's business has performed abysmally. It has accumulated over $23 million in losses, and has never experienced a profitable year. Although assumption of the Lease might allow the Debtor to continue its quarrying business, that business, as now conducted, is a losing proposition; the ability to continue operating, but only at a loss, does not justify assumption. While the new business of supplying marble for a New York condominium project is good news, the evidence showed no contract in place for future orders, nor other proof that the new business will likely continue. Other than speculation and conjecture, there was no proof that the new condominium business will generate revenues sufficient to cover operating overhead and ultimately produce profits sufficient to justify keeping the quarry open. Thus, at this juncture of the case, the Court can find no justification, much less one based on sound business judgment, for assuming the Lease. Unless there is a sea-change in the Debtor's prospects, continued losses – substantial losses – are imminent.

The cost of assumption must be considered in deciding whether it makes good business sense to assume a lease. As a condition to assumption, § 365(b)(1) requires a debtor to (i) cure outstanding defaults, or provide adequate assurance of a prompt cure, (ii) compensate the lessor

for pecuniary losses resulting for such defaults, or provide adequate assurance of prompt compensation, and (iii) provide adequate assurance of future performance. Depending on what defaults must be cured, assumption may be expensive or not practicable.

A substantial portion of the evidence presented by TBGS at the hearing on the Motions pertained to alleged defaults under the Lease and what it would cost to cure them. TBGS concentrated on paragraph 5 of the Lease in which the Debtor "agrees to quarry in a good and workmanlike manner in accordance with reasonably acceptable practices in the industry." TBGS attempted to show that the Debtor did not quarry in the prescribed manner, and was thus in default. For example, the Debtor's equipment is not just old, it is borderline derelict. According to TBGS's expert, an entirely new assemblage of mining equipment costing millions of dollars is required to bring the Debtor's operations up to "workmanlike" standards. However, the Debtor's equipment is the same as that used by PMMC when it operated the quarry, and was sold to the Debtor in conjunction with the Lease (TBGS Ex. 5, p. 13). Obviously, PMMC, the landlord for over 15 years, knew from the inception of the Lease what equipment the Debtor would be using to quarry marble. For better or worse, TBGS finds itself in the same shoes as its predecessor, PMMC, who at least acquiesced in, if not tacitly approved of the Debtor's quarrying practices for over 15 years without serious complaint. The Debtor's business was best described as a "mom and pop operation" and it is unreasonable for TBGS to now demand that the Debtor bring its quarrying methods and equipment up to international, state-of-the-art standards after PMMC acquiesced in the Debtor's method of operating the quarry since the inception of the Lease. Although the Lease does require the Debtor to operate the quarry in a "workmanlike manner," that standard must be measured by the same yardstick used by PMMC for the past 15 years; not the new metric that arrived with TBGS only a few months ago.

In deciding issues under Code § 365, the landlord's rights are to be protected as they existed upon the filing of the case; not expanded. "'Section 365 gives no indication that a landlord . . . is to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might have the opportunity to rent the premises to others at a higher base or percentage rent and would otherwise seek to escape the bargain it made.'" *In re M. Fine Lumber Co.*, 383 B.R. 565 (Bankr. EDNY 2008) (quoting *In re Natco Indus.*, 54 B.R. 436, 440 (Bankr. SDNY 1985)). The same could be said of TBGS seeking to extricate itself from the pattern and practice that established what was acceptable "workmanlike manner" by its predecessor, PMMC.

The deadline for the Debtor to file its disclosure statement and proposed plan is August 15, 2014 and the deadline for plan confirmation is October 14, 2014. For a disclosure statement to be approved in this case, it must support a finding of feasibility based on plausible facts, not mere speculation. During the hearing on the Motions, the Debtor offered little credible evidence that demonstrated it could continue its operations without substantial capital contributions from its principals and investors, and there was scant evidence of new and profitable business. Throwing good money after bad does not demonstrate feasibility or a probability of long-term success, and a willingness to inject capital to fuel a non-profitable business will not justify confirmation of a plan of reorganization.

Nonetheless, in light of the Lease being the lynchpin of any reorganization plan and the limited time before a disclosure statement is due to be filed, the Court will defer its decision on whether to approve an assumption of the Lease, or grant the Rejection Motion. Hopefully a disclosure statement will shed light on, among other obstacles to reorganization and plan confirmation, exactly how the Debtor will overcome the tall hurdle of feasibility. Code §

15

365(d)(2) anticipates that assumption or rejection of a lease will occur before confirmation of a plan. Accordingly, the Court will hold a final hearing on the Debtor's Motion to Assume and TBGS's Rejection Motion contemporaneously with the hearing to consider approval of the Debtor's disclosure statement. In addition to the evidence previously presented at the hearing on the Motions, the parties may offer additional evidence (not repetition) in support of their respective positions at the final hearing on Lease assumption and rejection. Of course, if the Debtor is not successful in obtaining court approval of a disclosure statement, and ultimately confirmation of a plan of reorganization, assumption or rejection of the Lease will no longer be an issue, and this case will be converted or dismissed.

## ORDER

For the reasons stated above, it is hereby ORDERED that –

(a) TBGS's Stay Relief Motion (Doc. 13) is DENIED;

(b) TBGS's Rejection Motion (Doc. 81) and the Debtor's Motion to Assume (Doc. 196) are CONTINUED, and will be heard at the same time the Debtor's disclosure statement is set for a hearing on its approval pursuant to clause (1) of Rule 2002(b) of the Federal Rules of Bankruptcy Procedure; and

(c) The Debtor's Response to Rejection Motion (Doc. 162) is moot and, therefore, DENIED.

So ORDERED this 8th day of August 2014

/s/ James J. Robinson
JAMES J. ROBINSON
U.S. BANKRUPTCY JUDGE